Slip Op. 20-63

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| T. T. INTERNATIONAL CO., LTD., | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Before: Claire R. Kelly, Judge |
| Defendant, | Court No. 19-00071 |
| and | |
| THE AMERICAN HFC COALITION ET AL., | |
| Defendant-Intervenors. | |

## OPINION AND ORDER

[Sustaining the U.S. Department of Commerce's final results in the 2016–2017 administrative review of the antidumping duty order on hydrofluorocarbon blends from the People's Republic of China.]

Dated: May 11, 2020

Matthew T. McGrath and Mert E. Arkan, Barnes, Richardson & Colburn, LLP, of Washington, DC, for plaintiff T.T. International Co., Ltd.

Joseph H. Hunt, Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With him on the brief were Jeanne E. Davidson, Director, Claudia Burke, Assistant Director, and Mollie L. Finnan, Trial Attorney. Of counsel on the brief was Daniel J. Calhoun, Assistant Chief Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

James R. Cannon, Jr. and Ulrika K. Swanson, Cassidy Levy Kent (USA) LLP, of Washington, DC, for defendant-intervenors Arkema Inc., The Chemours Company FC LLC, Honeywell International Inc., Mexichem Fluor Inc., and the American HFC Coalition.

Kelly, Judge:  This action is before the court on motion for judgment on the agency record.  See Pl.'s R. 56.2 Mot. J. Agency Rec., Nov. 12, 2019, ECF No. 23 ("Pl.'s Mot.").  Plaintiff T.T. International Co., Ltd. ("TTI") challenges various aspects of the U.S. Department of Commerce's ("Department" or "Commerce") final results in the 2016–2017 administrative review of the antidumping duty ("ADD") order on hydrofluorocarbon blends ("HFC") from the People's Republic of China ("PRC"), covering the period of review February 1, 2016 through July 31, 2017 ("POR").  See [HFC] from the [PRC], 84 Fed. Reg. 17,380 (Dep't Commerce Apr. 25, 2019) (final results of [ADD] admin. review and final determination of no shipments; 2016–2017) ("Final Results"), and accompanying Issues and Decision Memo. for the [ADD] Admin. Review, A-570-028, (Apr. 19, 2019), ECF No. 18-5 ("Final Decision Memo.").

TTI challenges four aspects of Commerce's determination as unsupported by substantial evidence and not in accordance with law.  See Memo. Points and Authorities Supp. [TTI's] Mot. J. Agency Rec. at 1–2, Nov. 12, 2019, ECF No. 23-1 ("Pl.'s Br."); see also Compl. at ¶¶ 13–38.[1]  First, TTI alleges that Commerce erroneously selected Mexico over Brazil as the primary surrogate country, when surrogate values from Mexico result in aberrational import values and result in excessive margins that do not reflect commercial or economic reality.  Id. at 1, 8–11.

---

[1] Although TTI states that it challenges Commerce's Final Results as contrary to law, see Pl.'s Br. at 1–2, the court understands TTI to make substantial evidence arguments.  See Pl.'s Br. at 5–18; see also Compl. at ¶¶ 13–38.  Therefore, the court will examine whether the Final Results are supported by substantial evidence and are in conformity with law.

Second, TTI contends that the use of Global Trade Atlas ("GTA") import data from Mexico ("Mexican GTA data") yields aberrational surrogate values ("SVs") to value the inputs R-134a (1,1,1,2-tetrafluoroethane) and R-32 (difluoromethane) under the Mexican Harmonized Schedule ("HS") subheading 2903.39.99, the input anhydrous hydrogen fluoride ("AHF") under the HS subheading 2811.11.01, and the byproduct hydrochloric acid ("HCl").  Id. at 1–2, 11–15.  Third, TTI argues that Commerce erroneously rejected certain financial statements in calculating surrogate financial ratios.  Id. at 2, 15–18.  Fourth, TTI challenges the 285.73 percent margin assigned to it as commercially and economically unrealistic, contrary to the legal standard established in Baoding Fine Chemistry v. United States, 39 CIT __, 113 F. Supp. 3d 1332 (2015) ("Baoding I").  Id. at 1, 5–8; see also Reply Br. Supp. [TTI's] R. 56.2 Mot. J. Agency R. at 1–10, Mar. 6, 2020, ECF No. 32 ("Pl.'s Reply Br."). Defendant and Defendant-Intervenors Arkema Inc., The Chemours Company FC LLC, Honeywell International Inc., Mexichem Flour Inc., and the American HFC Coalition counter that Commerce's determination is supported by substantial evidence and in accordance with law, and request the court to uphold the Final Results in its entirety. See Def.'s Resp. to [Pl.'s Mot.] at 1, 7–8, Feb. 7, 2020, ECF No. 28 ("Def.'s Br."); Resp. Br. [Def.-Intervenors], 2–5, 7, Feb. 7, 2020, ECF No. 29 ("Def.-Intervenors' Br.").  For the reasons set forth below, the court sustains Commerce's Final Results.

## BACKGROUND

On October 16, 2017, Commerce initiated an administrative review of the ADD order on HFC from the PRC.  See Initiation of Antidumping and Countervailing Duty Admin. Reviews, 82 Fed. Reg. 48,051, 48,055–56 (Dep't Commerce Oct. 16, 2017). Given that Commerce considers the PRC to be a non-market economy ("NME"), Commerce calculated TTI's dumping margin based on its factors of production ("FOPs") to produce HFC by using prices from a surrogate market economy country. See 19 U.S.C. § 1677b(c)(1), (4) (2012).[2]  When valuing FOPs, Commerce prefers to rely on a single or a primary surrogate country ("primary surrogate country").  See 19 C.F.R. § 351.408(c)(2) (2018).  To select that primary surrogate country, Commerce invited interested parties to comment on the list of potential surrogate countries, which included Romania, Mexico, Brazil, Bulgaria, Thailand, and South Africa.  See Letter from USDOC to File Pertaining to Interested Parties Surrogate Country Letter, PD 63–65, bar codes 3670978-01–03 (Feb. 8, 2017).[3]  In reply, TTI acknowledged that Commerce had used Mexico as a primary surrogate country in the underlying investigation and noted that Brazil may also be used.  See Letter from Barnes Richardson & Colburn to Sec of Commerce Pertaining to TTI Surrogate

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[3] On August 5, 2019, Defendant filed indices to the public and confidential administrative records underlying Commerce's final determination, on the docket, at ECF Nos. 18-1–2. Citations to administrative record documents in this opinion are to the numbers Commerce assigned to such documents in the indices.

Country Seln. Cmts. at 2, PD 74, bar code 3679309-01 (Mar. 5, 2018) ("TTI Surrogate

Country Cmts."); <u>see also</u> Letter from Barnes Richardson & Colburn to Sec of

Commerce Pertaining to TTI Surrogate Cmts., PD 80–101, bar codes 3685071-01–22

(Mar. 20, 2018) ("TTI SV Cmts."); Letter from Barnes Richardson & Colburn to Sec

of Commerce Pertaining to TTI Additional Surrogate Cmts, PD 119–121, bar codes

3740023-01–03 (Aug. 6, 2018).   TTI submitted information from Mexico to value

nearly all its FOPs,[4] <u>see</u> TTI SV Cmts. at Exs. 1–2, and placed, on the record, the

financial statements of Mexichem SAB de CV ("Mexichem") to calculate surrogate

financial ratios.  <u>See</u> <u>id.</u> at Ex. 7.

On September 11, 2018, Commerce issued its preliminary results.  <u>See</u> [HFC]

<u>from the [PRC]</u>, 83 Fed. Reg. 45,890 (Dep't Commerce Sept. 11, 2018) (prelim. results

[ADD] admin. review and prelim. determination of no shipments; 2016–2017)

("<u>Prelim. Results</u>"), and accompanying Decision Memo. for the Prelim. Results, A-

570-028, PD 137, bar code 3750975-01 (Aug. 31, 2018) ("Prelim. Decision Memo.").

Commerce explained that both Mexico and Brazil were at the same or comparable

level of economic development as the PRC and significant producers of HFC.  Prelim.

Decision Memo. at 11–12.   However, Commerce found that only Mexico offered

sufficient data to value all of TTI's FOPs, and that the data were country-wide,

publicly available, product-specific, representative of broad market averages,

---

[4] TTI submitted Brazilian data to value AHF and Thai data for HCl.  <u>See</u> TTI SV
Cmts. at Exs. 1–2.

generally contemporaneous with the POR, and tax exclusive.  Id. at 12.  Commerce

therefore selected Mexico as the primary surrogate country and calculated normal

value using Mexican SVs.  See Prelim Decision Memo. at 12, 17–21.  To value TTI's

inputs and to account for byproducts from processing HFC,[5] Commerce selected

Mexican GTA data.  Id. at 12, 18.  Further, Commerce used the financial statements

of CYDSA SAB de CV ("CYDSA") to calculate surrogate financial ratios, rejecting the

financial statements of Mexichem.  Id. at 20.  Commerce preliminarily assigned TTI

a weighted average dumping margin of 283.63 percent.  See Prelim. Results, 83 Fed.

Reg. at 45,891.

On April 19, 2019, Commerce issued its final results, where it continued to use

Mexico as the primary surrogate country and to rely on Mexican data to value TTI's

inputs, byproducts, and financial ratios.  See Final Results, 84 Fed. Reg. at 17,380;

Final Decision Memo. at 17–31.  After accounting for ministerial errors, Commerce

assigned TTI a weighted average dumping margin of 285.73 percent.  See Final

Results, 84 Fed. Reg. at 17,381; Final Decision Memo. at 4.

---

[5] In accordance with its practice, Commerce offset by-products, including HCl resulting from the production of HFC, in its calculation of normal value.  See Memo from USDOC to File Pertaining to TTI Margin Analysis Memo at 9, PD 143, bar code 3751835-01 (Sept. 4, 2018) (citing [HFC] from the [PRC], 81 Fed. Reg. 42,314 (Dep't Commerce June 29, 2016) (final determination of sales at less than fair value and final affirmative determination of critical circumstances), and accompanying Issues and Decision Memo. at 101–04, A-570-028, (June 21, 2016), available at https://enforcement.trade.gov/frn/summary/prc/2016-15298-1.pdf (last visited Apr. 30, 2020)).

## JURISDICTION AND STANDARD OF REVIEW

The court exercises jurisdiction pursuant to section 516A of the Tariff Act of 1930, 19 U.S.C. § 1516a, and 28 U.S.C. § 1581(c) (2012), which grant the Court authority to review final determinations in an ADD administrative review.  "The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.    Surrogate Country Selection

TTI argues that Commerce erroneously designates Mexico as the primary surrogate country, when record evidence indicates that Mexican GTA import data result in aberrational SVs.  See Pl.'s Br. at 8–11.  Instead, TTI advocates for the selection of Brazil as the primary surrogate country.  See id. at 10–11.  Defendant and Defendant-Intervenors counter that TTI failed to exhaust administrative remedies, because TTI did not raise this argument during the underlying administrative proceeding; and, notwithstanding the failure to exhaust, Commerce reasonably selects Mexico as the primary surrogate country.  See Def.'s Br. at 10–13; Def.-Intervenor's Br. at 11–13.  For the following reasons, TTI failed to exhaust its challenge to Commerce's surrogate country selection.

In an antidumping proceeding, if Commerce considers an exporting country to be an NME, like the PRC, it will identify one or more market economy countries to

serve as a "surrogate" for that NME country in the calculation of normal value.[6]  See 19 U.S.C. § 1677b(c)(1), (4).  Normal value is determined on the basis of FOPs from the surrogate country or countries used to produce subject merchandise.  See id. at § 1677b(c)(1).[7]  By statute, Commerce must value FOPs "to the extent possible . . . in one or more market economy countries that are . . . at a level of economic development comparable to that of the [NME], and . . . significant producers of comparable merchandise."  Id. at § 1677b(c)(4)(A)–(B).[8]  When several countries are both at a level of economic development comparable to the NME country and significant producers of comparable merchandise, Commerce evaluates the reliability and completeness of the data in similarly situated surrogate countries and generally selects the one with the best data as the primary surrogate country.  See Import Admin., U.S. Dep't

---

[6] Dumping occurs when merchandise is imported into the United States and sold at a price lower than its "normal value," resulting in material injury (or the threat of material injury) to the U.S. industry.  See 19 U.S.C. §§ 1673, 1677(34), 1677b(a).  The difference between the normal value of the merchandise and the U.S. price is the "dumping margin."  See id. at § 1677(35).  When normal value is compared to the U.S. price and dumping is found, antidumping duties equal to the dumping margin are imposed to offset the dumping.  See id. at § 1673; see generally Dorbest Ltd. v. United States, 604 F.3d 1363, 1367 (Fed. Cir. 2010).

[7] FOPs to be valued in the surrogate market economy include "hours of labor required," "quantities of raw materials employed," "amounts of energy and other utilities consumed," and "representative capital cost, including depreciation."  See 19 U.S.C. § 1677b(c)(3).

[8] This analysis is designed to determine a producer's costs of production in an NME as if that producer operated in a hypothetical market economy.  See, e.g., Downhole Pipe & Equipment, L.P. v. United States, 776 F.3d 1369, 1375 (Fed. Cir. 2015); Nation Ford Chemical Co. v. United States, 166 F.3d 1373, 1375 (Fed. Cir. 1999); see also 19 U.S.C. § 1677b(c)(1).

Commerce, <u>Non-Market Economy Surrogate Country Selection Process</u>, Pol'y

Bulletin 04.1 (2004), <u>available at</u> http://enforcement.trade.gov/policy/bull04-1.html

(last visited Apr. 30, 2020) ("Policy Bulletin 04.1"). Commerce prefers to use one

country surrogate as the primary surrogate country. <u>See</u> 19 C.F.R. § 351.408(c)(2).

     Further, parties are required to exhaust administrative remedies before the

agency by raising all issues in their initial case briefs before Commerce. <u>Dorbest Ltd.</u>

<u>v. United States</u>, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (citing 19 C.F.R.

§ 351.309(c)(2), (d)(2); <u>Mittal Steel Point Lisas Ltd. v. United States</u>, 548 F.3d 1375,

1383 (Fed. Cir. 2008)); <u>see also</u> <u>ABB, Inc. v. United States</u>, 920 F.3d 811, 818 (Fed.

Cir. 2019).   However, the court has discretion not to require exhaustion of

administrative remedies.   28 U.S.C. § 2637(d); <u>see also</u> <u>Agro Dutch Indus. Ltd. v.</u>

<u>United States</u>, 508 F.3d 1024, 1029 (Fed. Cir. 2007).   The Court has recognized

several limited exceptions to the doctrine of exhaustion of administrative remedies

such as: "where exhaustion would be 'a useless formality,' intervening legal authority

'might have materially affected the agency's actions,' the issue involves 'a pure

question of law not requiring further factual development,' where 'clearly applicable

precedent' should have bound the agency, or where the party 'had no opportunity' to

raise the issue before the agency."   <u>SeAH Steel Corp. v. United States</u>, 35 CIT 326,

329, 764 F. Supp. 2d 1322, 1325–26 (2011) (citing <u>Jiaxing Brother Fastener Co. v.</u>

<u>United States</u>, 34 CIT 1455, 1465–66, 751 F. Supp. 2d 1355–56 (2010)).

TTI failed to exhaust its administrative remedies, because it did not challenge Commerce's selection of Mexico or advocate for Brazil as the primary surrogate country despite opportunities to do so during the underlying proceeding.[9] See Final Decision Memo. at 24 (remarking that "no party is arguing that [Commerce] should pick Brazil as the primary surrogate country").  Replying to Commerce's proposed surrogate country list, TTI noted that Mexico had been used by the Department in the underlying investigation as a surrogate country and that Brazil, too, "may be used as an appropriate country[.]"  See TTI Surrogate Country Cmts. at 2.  However, TTI placed on the record possible SVs from Mexico for the vast majority of its FOPs.  See TTI SV Cmts. at Exs. 1–2.  Further, following the publication of its Preliminary Results, where Commerce preliminarily selected Mexico as the primary surrogate country, TTI only contested Commerce's selection of certain surrogate values but not its more general use of Mexico as the primary surrogate country.[10]  See Brief from Barnes Richardson & Colburn to Sec of Commerce Pertaining to TTI Case Brief at 5, PD 153–54, bar codes 3764266-01–02 (Oct. 19, 2018) ("TTI Case Brief"); see also Final Decision Memo. at 7 n. 35.  TTI's failure to raise this argument before Commerce

---

[9] Before the court, TTI argues that because the SVs from Mexico are aberrational and the selection of surrogate financial statements erroneous, they cannot support Commerce's selection of Mexico as the primary surrogate country.  See Pl.'s Br. at 9–11.  The court does not reach this argument here, because TTI failed to exhaust its administrative remedies.

[10] Although TTI challenged Commerce's selection of SVs for four FOPs—i.e., R-23, R-32, R-134A, and AHF—before the agency, TTI proposed Brazilian import values to be used for just AHF.  See generally TTI Case Brief at 2–5.

constitutes a failure to exhaust its administrative remedies.  Cf. Boomerang Tube

LLC v. United States, 856 F.3d 908, 912–13 (Fed. Cir. 2017); Qingdao Sea-Line

Trading Co. v. United States, 766 F.3d 1378, 1388 (Fed. Cir. 2014).  Therefore, the

court will not now address that issue, and Commerce's selection of Mexico as the

primary surrogate country is sustained.

## II.    Surrogate Value Selection

TTI contests Commerce's selection of Mexican GTA data to value the inputs R-

32, R-134a, and AHF as well as the byproduct HCl as unsupported by substantial

evidence and not in accordance with law.  See Pl.'s Br. at 11–15.  TTI points to

Commerce's selection of import data under certain HS categories for the inputs and

the byproduct, which it claims results in aberrational SVs that generate a

commercially and economically unrealistic dumping margin.  See id.  According to

TTI, to resolve this distortion in the calculation of normal value, Commerce should

use Mexican GTA import data under HS category 2903.39.02 to value R-32 and R-

134a and Brazilian GTA import data to value AHF.  See id.  Defendant and

Defendant-Intervenor respond that Commerce reasonably determines Mexican GTA

data to be the best available information to value the inputs and, further, disagree

that Commerce's selection of import data under the HS categories results in distorted

SVs.  See Def.'s Br. at 14–19; Def.-Intervenor's Br. at 13–19.  Further, Defendant and

Defendant-Intervenor argue that TTI failed to exhaust its administrative remedies

with respect to Commerce's valuation of the byproduct HCl.  See Def.'s Br. at 19–21;

Def.-Intervenor's Br. at 19.   For the reasons that follow, the court sustains

Commerce's reliance on certain HS categories in selecting Mexican GTA import data

to value the inputs R-32, R-134a, and AHF and to value the byproduct HCl.

### A.    Legal Standard

As explained above, in an antidumping proceeding involving an NME, normal

value is determined on the basis of FOPs from the surrogate country or countries

used to produce subject merchandise.   See 19 U.S.C. § 1677b(c)(1).   FOPs to be valued

in the surrogate market economy include "hours of labor required," "quantities of raw

materials employed," "amounts of energy and other utilities consumed," and

"representative capital cost, including depreciation."   See id. at § 1677b(c)(3).   Section

1677b requires Commerce to use "the best available information" to value FOPs.   Id.

at § 1677b(c)(1).   Commerce has discretion to determine what constitutes the best

available information.   QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir.

2011).   "Commerce generally selects, to the extent practicable, surrogate values that

are publicly available, are product-specific, reflect a broad market average, and are

contemporaneous with the period of review" (collectively, "selection criteria").

Qingdao Sea-Line Trading, 766 F.3d at 1386; see also Policy Bulletin 04.1.   However,

Commerce may disregard aberrational values to value FOPs.   Antidumping Duties;

Countervailing Duties, 62 Fed. Reg. 27,296, 27,366 (Dep't Commerce May 19, 1997).

Where there is evidence that data is aberrational, Commerce must address that

evidence in order to demonstrate that the data is nonetheless the best information

available.[11]  See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) (noting

that "[t]he substantiality of evidence must take into account whatever in the record

fairly detracts from its weight."); see also Jacobi Carbons AB v. United States, 619

Fed. Appx. 992, 1001 (Fed. Cir. 2015).

### B.      Valuation of inputs R-32, R-134a, and AHF

Commerce reasonably relies on Mexican GTA data to value R-32, R-134a, and

AHF.  See Final Decision Memo. at 20–25.   After determining Mexico to be the

primary surrogate country, Commerce selects GTA import data from Mexico to value

TTI's FOPs, because the Mexican GTA import data "are broad market averages, . . .

tax-exclusive, and generally contemporaneous with the POR" as well as enable

specific valuation of TTI's FOPs.  See Prelim. Decision Memo. at 12, 18; see also Memo

from USDOC to File Pertaining to TTI Margin Analysis Memo at 6, PD 143, bar code

3751835-01 (Sept. 4, 2018) ("TTI SV Memo.").   Commerce selects HS categories, at

least at the six-digit level, that encompass TTI's inputs.  See TTI SV Memo. at 5–7.

With respect to R-32 and R-134a, Commerce determines that the eight-digit

HS category 2903.39.99 is specific to those inputs, because it is the only category that

---

[11] An agency's determination is supported by substantial evidence when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Nippon Steel Corp. v. United States, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).   "[T]he possibility of drawing two inconsistent conclusions from the evidence does not invalidate Commerce's conclusion as long as it remains supported by substantial evidence on the record."  Zhaoqing New Zhongya Aluminum Co. v. United States, 36 CIT 1390, 1392, 887 F. Supp. 2d 1301, 1305 (2012) (citing Universal Camera Corp., 340 U.S. 474, 488 (1951)).

encompasses the inputs.  <u>See</u> Final Decision Memo. at 20, 20 n.100.  Commerce

observes that the six-digit HS category 2903.39 includes HFC components.  <u>Id.</u> at 20

n.100.  Commerce reasons, by process of elimination, that among the possible HS

categories at the eight-digit level, only 2903.39.99 (others) covers R-32 and R-134a.

<u>Id.</u>  Commerce relies on data from the National Institutes of Standards and

Technology indicating that the difluoroethane and methyl bromide covered under HS

categories 2903.39.02 and 2903.39.01, respectively, are different chemicals than

1,1,1,2-tetrafluoroethane (R-134a) and difluoromethane (R-32).  <u>Id.</u> (citing Letter

from Cassidy Levy Kent (USA) LLP to Sec of Commerce Pertaining to Petitioners

Rebuttal Surrogate Cmts at Ex. 1, PD 103, bar code 3688789-01 (Mar. 30, 2018)

("Petitioners' Rebuttal Cmts.")).  As a result, Commerce reasonably concludes "R-32

and R-134a can only be imported under the basket category 2903.39.99."  <u>Id.</u>

Similarly, Commerce relies on import data under the HS category 2811.11.01 to value

AHF because it encompasses AHF and specifically references that input.  <u>See</u> Final

Decision Memo. at 25.

TTI, however, argues that Commerce's selection of HS category 2903.39.99 to

value R-32 and R-134a and HS category 2811.11.01 to value AHF yield aberrational

SVs.  Pl.'s Br. at 11–15.  Plaintiff's arguments are unavailing, because Commerce

addresses and reasonably rejects the same contentions in the underlying proceeding.

<u>See</u> Final Decision Memo. at 20–25.  With respect to the inputs R-32 and R-134a, TTI

contends before the court that the Mexican GTA import data under HS category

2903.39.99 are aberrationally high, because this "other" category includes high-value

components, such as R-23, not used in TTI's production process, resulting in SVs

higher than TTI's selling prices for the finished HFC blend. See Pl.'s Br. at 11–12.

However, Commerce reasonably finds no record evidence indicating that the presence

of other components in HS category 2903.39.99 distorts the valuation of R-32 and R-

134a. See Final Decision Memo. at 20–22.[12] Specifically, an examination of actual

imports for the POR demonstrate that the majority of imports under this HS category

were of R-134a. Id. at 21.[13] Commerce further observes that there was no evidence

of imports of R-23 during the POR that would support TTI's claim that import values

under HS category 2903.39.99 are distorted by the inclusion of this allegedly high-

value component. See id. at 20 n.104. Commerce explains the mere fact that SVs for

---

[12] In the underlying proceeding, TTI also pointed to the difference in average unit values ("AUV") of the HFC components in the PIERS data, another data source on the record, as compared to the GTA data. See Final Decision Memo. at 18, 21 (citing TTI's Case Br. at 3); see also Letter from Cassidy Levy Kent (USA) LLP to Sec of Commerce Pertaining to HFC Coalition Prelim Determination Cmts at Ex. 2, CD 54, bar code 3741009-01 (Aug. 6, 2018) ("Petitioners' Prelim. Cmts."). Commerce, however, reasonably finds that a comparison of the two data sets is not a reliable basis to determine alleged aberrancy, because the PIERS data and GTA data do not align in terms of product descriptions. Final Decision Memo. at 21 (explaining that "[t]he PIERS data provide a description of the merchandise in each shipment" and "the GTA do not provide a breakdown of the specific products included in the data, beyond the heading of the HS category"). Commerce also rejects the difference in AUV of imports under HS 2903.39.99 and that of imports under HS 2390.39.02 as suggesting that the SV is less accurate, when, the AUVs for each country were "in a continuum of values." See id. at 21, 21 n.108.

[13] Further, Commerce notes that there is no evidence of R-23, the high-value component cited by TTI, see TTI Case Brief at 2–3, was imported under the HS category 2903.39.99. See Final Decision Memo. at 20–21 n.104; see also Petitioners' Prelim. Cmts. at Ex 2.

TTI's FOPs exceed TTI's selling prices for finished HFC does not establish aberrancy

of those SVs, when "the unit value of one or more inputs may well be higher than the

finished product if the finished product is sold at prices significantly below normal

value, as [Commerce has] determined here." <u>See</u> Final Decision Memo. at 22.

Although TTI argues before the court that Commerce's decision is unsupported by

substantial evidence and contrary to law, it does not elaborate why Mexican GTA

data under the HS category 2903.39.02 should instead be used to value the

components R-32 and R-134a, when it concedes this HS category does not encompass

those components, unlike the HS category 2903.39.99. <u>See</u> Pl.'s Br. at 11–12.[14]   TTI

asks the court to substitute its judgment for Commerce's and to reweigh evidence,

which the court cannot do. <u>See</u> <u>Downhole Pipe & Equipment, L.P. v. United States</u>,

776 F.3d 1369, 1376 (Fed. Cir. 2015).   Even if reasonable minds may disagree, the

court cannot say that Commerce's determination is unsupported by substantial

evidence or contrary to law. <u>Cf.</u> <u>Zhejiang DunAn Hetian Metal Co. v. United States</u>,

652 F.3d 1333, 1341 (Fed. Cir. 2011).

---

[14] In the underlying proceeding, Commerce rejects TTI's view that R-152a is sufficiently similar to R-32 and R-134a such that the HS category 2903.39.02, covering R-152a, may be used. <u>See</u> Final Decision Memo. at 18, 22 (citing TTI's Case Br. at 4). Commerce emphasizes that R-152a differs from R-32 and R-134a such that "any imports of [R-152a] are less specific than imports of R-32 and R-134a themselves." <u>See</u> Final Decision Memo. at 22.   Commerce reasonably declines to adopt HS category 2903.39.02, when TTI offers no reason why that category would be more specific to the input and when Commerce finds no reason to reject the import values under HS category 2903.39.99. <u>See</u> <u>id.</u>

Likewise, TTI does not persuade that the selection of import values from the HS subheading 2811.11.01 for AHF results in a distorted SV. See Pl.'s Br. at 12–13. TTI's argument proceeds from the premise that relying on the Mexican GTA import data under this category results in an aberrational SV for AHF, because the value is three times higher than Brazilian GTA import data under the subheading 2811.11. See Pl.'s Br. at 13. However, a comparison of the value of imports under a narrow eight-digit subheading with those under a general six-digit subheading does not necessarily indicate distortion in this case. See Final Decision Memo. at 25. In the underlying proceeding, Commerce rejects TTI's argument that the higher volume of imports into Brazil under the general six-digit HS category compared to the smaller volume of imports into Mexico under the narrow eight-digit HS category demonstrates the superiority of the Brazilian GTA import data, when import volume is not one of Commerce's SV selection criteria. See Final Decision Memo. at 23–25; cf. Qingdao Sea-Line Trading, 766 F.3d at 1386; Policy Bulletin 04.1. Further, TTI does not persuade that the Brazilian GTA import data are the best available information to value AHF simply because Brazil would be a viable alternate surrogate market economy country from which to select SVs. See Pl.'s Br. at 13. Rather, as Commerce explains, it prefers to select SVs from the primary surrogate country. See Final Decision Memo. at 24–25; see also 19 C.F.R. § 351.408(c)(2). Commerce declines to select less specific data from Brazil, absent a finding that the Mexican GTA data are invalid. Final Decision Memo. at 25. The court cannot say

Commerce acted unreasonably in selecting Mexican GTA import data under the HS category 2811.11.01 to value AHF.  Cf. Zhejiang, 652 F.3d at 1341 (noting that Commerce has "broad discretion" to determine the best available information to value of FOPs).

### C.    Valuation of byproduct HCl

TTI did not exhaust its administrative remedies in challenging Commerce's valuation of byproduct HCl.  As explained above, a party is generally required to raise all arguments in the administrative proceeding as a prerequisite to judicial review. 28 U.S.C. § 2637(d); see also Boomerang Tube, 856 F.3d at 912–13.  TTI, here, had notice that Commerce would rely on Mexican GTA data to value the byproduct HCl as of the preliminary determination.  See Prelim. Decision Memo. at 19–20; see also TTI SV Memo. at 5, 9.  However, TTI did not challenge that decision in the underlying administrative proceeding.  See generally TTI Case Brief; see also Final Decision Memo. at 7 n.35 (listing the SVs challenged by TTI).  Although the court will not require exhaustion in certain scenarios, see SeAH Steel Corp, 35 CIT at 329, 764 F. Supp. 2d at 1325–26, none of those exceptions are invoked here.  See generally Pl.'s Br.; Pl.'s Reply Br.  Further, TTI does not address the allegations that it failed to exhaust its challenge to Commerce's valuation of HCl.  Compare Def.'s Br. at 19–21 and Def.-Intervenor's Br. at 19 with Pl.'s Reply Br. at 1–10.  Given that Commerce did not have the opportunity to hear the challenge in the first instance, the court

declines to hear TTI's challenge regarding the valuation of HCl, and Commerce's

reliance on Mexican GTA data for that byproduct is sustained.

## III.   Selection of Surrogate Financial Statements

TTI argues that Commerce's decision to rely solely on CYDSA's financial

statements to calculate surrogate financial ratios is unsupported by substantial

evidence and contrary to law.  See Pl.'s Br. at 15–18.  Instead, according to TTI,

Commerce should average CYDSA's and Mexichem's financial statements.  See id.

TTI elaborates that Commerce erroneously rejects Mexichem's financial statements,

which offer detailed, disaggregated financial information.  See id.  Defendant and

Defendant-Intervenors reply that Commerce reasonably declines to rely on

Mexichem's financial statements, because they were not fully translated.  See Def.'s

Br. at 21–26; see also Def.-Intervenors' Br. at 20–22.  For the reasons that follow,

Commerce reasonably rejects Mexichem's financial statements to calculate surrogate

financial ratios.

As explained above, in an NME proceeding, Commerce determines normal

value on the basis of FOPs from the surrogate country or countries used to produce

subject merchandise.  See 19 U.S.C. § 1677b(c)(1).  After calculating the total value

of FOPs, Commerce will add "an amount for general expenses and profit plus the cost

of containers, coverings, and other expenses."  Id.  To do so, Commerce calculates

"surrogate financial ratios" that the agency derives from the financial statements of

one or more companies that produce identical or comparable merchandise, preferably

in the primary surrogate country.  <u>See</u> 19 C.F.R. § 351.408(c)(4); <u>Dorbest</u>, 604 F.3d at

1368.  Commerce selects financial statements based on "specificity, contemporaneity,

and quality of the data."  <u>See</u> Final Decision Memo. at 28 (citing <u>Diamond Sawblades</u>

<u>and Parts Thereof from the [PRC]</u>, 71 Fed. Reg. 29,303 (Dep't Commerce May 22,

2006) (final determination of sales at less than fair value and final partial affirmative

determination of critical circumstances), and accompanying Issues and Decision

Memo.   at   4–10,   A-570-900,   (May   15,   2006),   <u>available   at</u>

https://enforcement.trade.gov/frn/summary/prc/E6-7763-1.pdf (last visited Apr. 30,

2020) (internal quotations omitted)).   In addition, Commerce rejects financial

statements that it has reason to believe or suspect are distorted by countervailable

subsidies.  <u>See</u> Final Decision Memo. at 28 (citing <u>Admin. Review of Certain Frozen</u>

<u>Warmwater Shrimp from the [PRC]</u>, 75 Fed. Reg. 49,460 (Dep't Commerce Aug. 13,

2010) (final results and partial rescission of [ADD] admin. review), and accompanying

Issues and Decision Memo. at 22–25, A-570-893, (Aug. 9, 2010), <u>available at</u>

https://enforcement.trade.gov/frn/summary/prc/2010-20073-1.pdf (last visited Apr.

30, 2020)); <u>see also</u> 19 U.S.C. § 1677b(c)(5).  As with other documents submitted in

an antidumping duty proceeding, financial statements in a foreign language "must

be accompanied by an English translation of the entire document or of only pertinent

portions, where appropriate[.]"  19 C.F.R. § 351.303(e).

  Here, Commerce reasonably rejects Mexichem's financial statements, because

the incomplete translation precludes Commerce from assessing vital information in

those statements. <u>See</u> Final Decision Memo. at 26–31. Specifically, TTI provided an

English translation of only a single worksheet with Mexichem's profits and losses.

<u>Id.</u> at 29. Without further translation—i.e., of Mexichem's accounting policies, its

auditor's report, or the balance sheet—Commerce explains that it cannot evaluate

"other vital information" including "if Mexichem received countervailable subsidies,

if its statements contain an unqualified auditor's opinion, and whether TTI has

appropriately categorized, added, and/or removed certain expenses in its calculation

worksheet." <u>Id.</u> at 29. Therefore, Commerce, in light of these "serious translation

deficiencies," reasonably declines to use Mexichem's financial statements to calculate

surrogate financial ratios. <u>See</u> <u>id.</u> at 29; <u>see also</u> <u>Qingdao Sea-Line Trading</u>, 766 F.3d

at 1386 ("Commerce has broad discretion to determine what constitutes the best

available information.")

 According to TTI, however, Commerce erroneously rejects Mexichem's

financial statements, because they are "substantively translated with respect to 'vital'

information." <u>See</u> Pl.'s Br. at 15. TTI explains that, pursuant to <u>CP Kelco US, Inc. v.</u>

<u>United States</u>, Commerce may not reject a partially translated financial statement

without demonstrating that the untranslated portion contained "vital information."

<u>See</u> <u>id.</u> at 15–16 (citing <u>CP Kelco</u>, Slip Op. 18-120 at 5, 42 CIT __, __ (Sept. 17, 2018),

<u>aff'd</u> in part, <u>rev'd</u> in part, 949 F.3d 1348, 1359 (Fed. Cir. 2020) (affirming Commerce

decision to reject partially translated financial statements in light of its explanation

that the untranslated information was vital but declining to decide "whether

Commerce must accept or refuse a partial translation of financial statements in every case, or that it is required to do so").[15]  Extending the CP Kelco holding to the facts of this case does not help TTI.[16]  Commerce identifies what information it suspects is

---

[15] In addition, TTI contends that Commerce should have granted TTI the opportunity to submit a translated copy of Mexichem's financial statement.  See Pl.'s Br. at 18. Commerce, however, reasonably exercised its discretion by declining to reopen the record after issuing the preliminary results.  See Final Decision Memo. at 31. According to Commerce's regulations, factual information to value FOPs are due "no later than 30 days before the scheduled date of the preliminary results of review."  19 C.F.R. § 351.301(c)(3)(ii).  Within ten days of submitting that information, parties have an opportunity to submit "publicly available information to rebut, clarify, or correct such factual information" accompanied with written explanation.  Id. at § 351.301(c)(3)(iv).  In addition, Commerce may extend deadlines for good cause if those requests are submitted prior to the original deadlines, unless the party demonstrates extraordinary circumstances.  Id. at § 351.302(b)–(c).  Here, TTI did not seek to submit a full translation of Mexichem's financial statement until October 19, 2018, after Commerce published its preliminary determination.  To that end, however, TTI merely stated "there is no reason why the Department could not still accept a full translation of what is already on the record, given the length of time that remains before a final determination is scheduled to take place (January 9, 2019)." See TTI Case Brief at 7–8.  Commerce reasonably rejects this view, explaining that accepting the translation would "inhibit the timely completion of the review" because "it would be necessary to allow parties to comment on the new information and to establish a second, subsequent briefing schedule" and "[Commerce] would also require time to evaluate that new information."  Final Decision Memo. at 31.  Further, to the extent that TTI implies that Commerce should have alerted TTI of deficiencies prior to the preliminary determination, the parties, not Commerce, carry the burden of creating an adequate record.  See Pl.'s Br. at 18; see also QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011).

[16] TTI cites the court's decision affirming Commerce's fourth remand determination. However, relevant to TTI's argument, is the court's decision reviewing Commerce's second remand redetermination and ordering remand for the third time, CP Kelco, Inc. v. United States, 41 CIT __, 211 F. Supp. 3d 1338 (2017) ("CP Kelco I").  In that case, and unlike the situation here, Commerce disregarded financial statements that had been translated in full, except for two paragraphs of a single footnote.  See CP

(footnote continued)

not translated, explains why it considers that information is vital, and reasonably

concludes that without a full translation it cannot verify Mexichem's financial

statements and rely on them to calculate surrogate financial ratios.  See Final

Decision Memo. at 29.[17]  The court cannot say that Commerce's determination is

unreasonable and therefore sustains Commerce's rejection of Mexichem's financial

statements.

## IV.  Whether TTI's Dumping Margin is Contrary to Law

TTI argues that Commerce's assignment of a 285.73 percent average-weighted

dumping margin to TTI defies commercial and economic reality, contrary to what it

---

Kelco I, 41 CIT at __, 211 F. Supp. 3d at 1343–44.  The court faulted Commerce's purported practice of outright rejecting partially translated financial statements as unreasonable, because "an unduly rigid, one-size-fits-all practice" is not consistent with its statutory mandate to identify the best available information and to meaningfully analyze record evidence. Id., 41 CIT at __, 211 F. Supp. 3d at 1342–43. Given that Commerce expressed generalized concerns about a particular untranslated footnote, the court held that Commerce's rejection of the financial statements was not reasonable. Id., 41 CIT at __, 211 F. Supp. 3d at 1343–45. Among the possible paths Commerce could avail itself on remand, the court explained that Commerce could reject the financial statements if it made "a reasoned finding" that the untranslated paragraphs were "vital" to the Department's analysis. Id., 41 CIT at __, 211 F. Supp. at 1345.

[17] Specifically, Commerce notes that TTI did not provide a translation of explanatory notes accompanying the translated worksheet, information about Mexichem's accounting policies, the auditor's opinion, the director's report, and the balance sheet, among other information.  Final Decision Memo. at 29.  Without this information, Commerce explains it is precluded from "attest[ing] to the legitimacy and accuracy of the information TTI uses to calculate the [surrogate financial] ratios proposed in [TTI's] calculation worksheet" and from "assessing other vital information, such as determining if Mexichem received countervailable subsidies, if its statements contain an unqualified auditor's opinion, and whether TTI has appropriately categorized, added, and/or removed certain expenses in its calculation worksheet." Id.

claims is the legal standard established in <u>Baoding Fine Chemistry v. United States</u>, 39 CIT __, 113 F. Supp. 3d 1332 (2015).  <u>See</u> Pl.'s Br. at 5–8; <u>see also</u> Pl.'s Reply Br. at 1–10.  Even though the margin "is the inevitable consequence of the Department's use of aberrational SVs to value TTI's FOPs" according to TTI, it argues that the margin is also "independently 'commercially impossible.'"  Pl.'s Br. at 6; Pl.'s Reply Br. at 4–5.  Defendant and Defendant-Intervenors respond that TTI's margin is in accordance with law and supported by substantial evidence, because Commerce selected SVs and surrogate financial statements consistent with statute and regulations.  <u>See</u> Def.'s Br. at 26–30; Def.-Intervenors' Br. at 8–11.  For the reasons that follow, Commerce reasonably and consistently with its statutory mandate calculates TTI's margin.

A dumping margin is "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise."  19 US.C. § 1677(35)(A).[18]  If the exporting country is designated as an NME, "sales of merchandise in [that NME] country do not reflect the fair value of the merchandise." <u>Id.</u> at § 1677(18)(A).  Therefore, Commerce determines normal value based on an NME producer's FOPs, used to produce the subject merchandise, in an ME country or countries.  <u>See</u> <u>id.</u> at § 1677b(c); <u>see also</u> 19 C.F.R. § 351.408.  Commerce then

---

[18] A weighted average dumping margin is "the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer." 19 U.S.C. § 1677(35)(B).

compares normal value with the producer's price for sales of subject merchandise into the United States, i.e., export price, to determine normal value.  See 19 U.S.C. § 1677b(c)(1).

Consistent with its statutory mandate, Commerce reasonably arrives at TTI's dumping margin by comparing normal value with export price.  See TTI Memo. from USDOC to File Pertaining to TTI Final Calc. Memo., CD 150, bar code 3824768-01 (Apr. 19, 2019).  TTI takes issue with that margin, arguing that it is "an absurd, commercially and economically unrealistic figure."  Pl.'s Br. at 6.  However, TTI does not persuade that the margin is contrary to law or unsupported by substantial evidence.

TTI's argument proceeds from the mistaken premise that the value of a dumping margin, distinct from the components that constitute the margin, may be challenged.  To ground this assertion, TTI refers to the court's decision in Baoding I as setting forth a "commercial impossibility" test that probes whether a high margin is unsupported by substantial evidence.  See Pl.'s Br. at 6–8; Pl.'s Reply Br. at 2–4.[19] However, in Baoding I, the court faulted the way in which Commerce calculated the dumping margin, including the challenged SVs for certain inputs and surrogate

_____

[19] According to TTI, the "commercial impossibility" test assesses if "1) Respondent would have had to sell its merchandise at an absurd, commercially impossible loss; and, 2) if Respondent's financial statements showed any corresponding losses."  Pl.'s Reply. Br. at 8–9 (citing Baoding I, 39 CIT at __, 113 F. Supp. 3d at 1334).

financial statements.[20]  39 CIT at __, 113 F. Supp. 3d at 1341–42 (holding in abeyance

specific challenges to aspects of Commerce's margin calculation, given that they may

change on remand).  Thus, contrary to TTI's argument, Baoding I did not establish a

separate, "backstop" test for high margins that could independently require remand

if found by the court to be "commercially impossible."[21]  See Pl.'s Reply Br. at 3; see

also Timken Co. v. United States, 354 F.3d 1334, 1344 (Fed. Cir. 2004) ("[T]he 'fair

comparison' requirement of [19 U.S.C.] § 1677b(a) does not impose any requirements

for calculating normal value beyond those explicitly established in the statute and

---

[20] In Baoding I, Commerce assessed a dumping margin of 453.79 percent to the plaintiff, which was several multiples higher than the rate assigned in prior reviews and the China-wide rate, determined pursuant to facts otherwise available and with an adverse inference.  See Baoding I, 39 CIT at __, 113 F. Supp. 3d at 1339.

[21] Plaintiff also argues that the Court of Appeals for the Federal Circuit's decision in Nan Ya Plastics, issued subsequently to Baoding I, did not invalidate the basis for the "commercially impossible" standard established in that earlier decision.  See Pl.'s Reply Br. at 2, 4 (citing Nan Ya Plastics Corp., Ltd v. United States, 810 F.3d 1333 (Fed. Cir. 2016)).  According to Plaintiff, the court, in Baoding II, distinguished that standard from the holding in Nan Ya Plastics.  Id. at 4.  However, contrary to Plaintiff's argument that Baoding I stands apart from Nan Ya Plastics, the Baoding II court explained that even though Nan Ya Plastics involved different facts and issues, the appellate court's holding was consistent with its own.  Baoding Fine Chemistry v. United States, 41 CIT __, __, 222 F. Supp. 3d 1231, 1239 (2017) ("Baoding II") ("[A] margin is accurate if it is supported by substantial evidence and reflects commercial reality if it is consistent with the statutory method. Nan Ya Plastics Corp., 810 F.3d at 1344. The Department's determination of a 453.79% margin for Baoding Mantong in the Final Results did not satisfy this standard.").

does not carry over to create additional limitations on the calculation of dumping

margins.").[22]

Moreover, Commerce reasonably selects the inputs to its calculation, because,

in addition to the reasons explained above, Commerce also reexamines the source

data in light of TTI's allegation that the margin is inaccurate and commercially

unrealistic.[23] See Final Decision Memo. at 7–8.  However, Commerce "find[s] nothing

unusual" about its SV selections.  Id. at 7.  Indeed, the SVs for R-32, R-134a, and AHF

are "generally consistent" with the SVs calculated in the underlying less-than-fair-

value ("LTFV") investigation, because "the SVs increased for R-32/R-134a by 15.6

percent and AHF by 3.2 percent[.]"  Id. at 7 n.36.  The surrogate financial ratios,

---

[22] TTI's advocacy for a "backstop" test is misplaced.  As a preliminary matter, the court in Baoding I addressed whether Commerce's determination was supported by substantial evidence and in accordance with law in that case.  See Baoding I, 39 CIT at __, 113 F. Supp. 3d at 1336.  The opinion does not establish legal precedent or bind other determinations by this Court.  See, e.g., Nucor Corp. v. United States, 32 CIT 1380, 1447 n.47, 594 F. Supp. 2d 1380–81 n.47 (2008), aff'd, 601 F.3d 1291 (Fed. Cir. 2010).  Further, under TTI's theory, a plaintiff could fail to challenge, for example, Commerce's selection of surrogate values or surrogate financial statements, following the issuance of a preliminary determination, and still obtain review of the resultant margin.  However, such "backstop" judicial review would render the general requirement that parties exhaust their administrative remedies a nullity, undercutting the "general policies underlying the exhaustion requirement— 'protecting administrative agency authority and promoting judicial efficiency.'"  Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (citing McCarthy v. Madigan, 503 U.S. 140, 145 (1992)).

[23] TTI attempts to link its argument that its margin does not reflect "commercial or economic reality" to the individual SVs selected by Commerce.  See, e.g., Pl.'s Br. at 5–6, 11–14.  However, for the reasons discussed above, TTI does not demonstrate that Commerce's selection of any of the individual components of Commerce's margin calculation was unreasonable.

Commerce explains, are also "similar to the ratios computed for the same Mexican producer used in the LTFV investigation (e.g., the SG&A percentage was 31.77 percent in the LTFV investigation and is 28.74 percent now)." Id. TTI's arguments are unpersuasive, as they fail to demonstrate that Commerce's determinations regarding the constituent elements are unsupported by the record. Therefore, the court sustains TTI's margin, because it is in accordance with law and supported by substantial evidence.

## CONCLUSION

Commerce's <u>Final Results</u> is sustained in its entirety. Judgment will enter accordingly.

                                                     /s/ Claire R. Kelly
                                                     Claire R. Kelly, Judge

Dated:        May 11, 2020
              New York, New York